JOHN BROWN, appellant, *v.* ANTHONY CANNON, appellee.

*Appeal from Warren.*

One party to a contract cannot complain of the other until he has put his adver-
sary in default by a substantial performance on his part, and a failure or refu-
sal to perform by the other.

A purchaser who has bargained for a good title will not be compelled to take
one which is subject to suspicion. It must be free from reasonable doubt,—
such a title to which no reasonable man would object,—one which a prudent
man would not hesitate to purchase at a full market price. It is not suffi-
cient, that the title is probably good, but it must be one which the purchaser
must feel a reasonable certainty that it is so.

A decree directed certain personal property specified in a contract to be apprais-
ed by the sheriff: *Held,* that the value should have been found by the court,
a Master in Chancery or special Commissioner through the medium of testi-
mony, and not on inspection.

BILL IN CHANCERY for a specific performance, filed in the
Warren Circuit Court by the appellee against the appellant,
and heard before the Hon. Norman H. Purple.

The bill stated, in substance, that on the 9th day of October,
A. D. 1844, Cannon sold to Brown, by a written contract, a
certain tract of land; that he agreed to make certain im-
provements on the premises in a good and workmanlike man-
ner by the first day of the ensuing April, and, as soon as
Brown should perform the conditions of the contract on his
part, to execute to said Brown "a good, general warranty
deed for the premises," and to prevent waste in the mean
time; that Brown agreed to pay $1100 on signing the agree-
ment, and $400 on or before the said first day of April, in
manner following, to wit: two horses at a fair market price,
a two horse carriage with wooden springs and harness at a
fair price, and the balance of $400 in cash; and further,
that Brown would then execute three notes for $166·66⅔
cents, payable in one, two and three years after date, mak-
ing in all the sum of $2000.

The bill further stated that the first payment was made
according to the terms of the contract, but that Brown failed

to make the other payments and to execute the notes; that Cannon performed his part of the contract, except making a small portion of the repairs, which he afterwards offered to make, but was prevented from making them by Brown; that Brown took possession of the farm about said first day of April and has since remained in possession; that Cannon tendered a deed and avowed his readiness to perform, but that Brown, on his part, refused to comply with the terms of the contract. The prayer of the bill was for a specific performance.

Brown filed an answer under oath admitting the contract, but denying that Cannon had performed; averred performance on his part, and stated the following facts, to wit: that when the contract was made, he lived in Ohio; that in the spring he left that State to remove to Illinois, expecting to arrive here by the first of April, but, on account of unavoidable delays, did not arrive until the 3rd day of April; that on the tenth day of the month, he tendered the carriage and horses and the balance of the payment of $400 to Cannon, who refused to accept the same because the tender was not made at the time specified in the contract, although Cannon was in default in not making the repairs he had agreed to make.

The answer denied that Cannon tendered a deed, but stated that he merely read a deed to Brown without offering to deliver it to him, or to exhibit his title or an abstract of it. It further stated that Cannon had not a clear title to the premises, but that certain individuals held an adverse outstanding title to the quarter section on which the farm is situated, and that such title was paramount to Cannon's title. It further stated that Brown had always been ready to perform and was still so ready; that the property had been valued and was ready for delivery when Cannon should perform on his part; and that Cannon did not make the improvements stipulated in the contract.

There was a replication to the answer.

It was proved that Brown did not arrive at the county of Warren until about the 3rd of April; that he soon afterwards

made a tender of the horses, carriage and harness to Cannon, and professed himself ready and willing to pay the balance of the payment of $400; that Cannon refused to receive the property, whereupon Brown caused the same to be appraised, and offered to deliver the same to Cannon at any time.

It was further proved that Cannon, did not make all the repairs on the house and fencing which, by the contract he had agreed to make, and that such as were made were not made in the good and workmanlike manner contemplated by the contract. It was also proved, that at the time of making the contract, Cannon assured Brown that his title was good,—as good as any in the State of Illinois. It was proved by Cannon's son that he had heard his father say that there was an old tax title on the land, which one Porter, who was present at the time, said was worthless. Porter, however, and other witnesses present swore that Cannon said nothing about a tax title on the land, and that nothing was said by any one present about such a title.

There was some evidence in relation to a deed having been tendered, but that Cannon, on tendering the deed, required the performance of conditions on the part of Brown not contained in the contract. The record further showed that Cannon proved on the trial a title to the land derived from the Patentee, and that Brown, at the same time, proved an outstanding tax title for a quarter section of the land, the sale for taxes having been made in 1834, and the deed in 1836. It further appeared that Cannon bought his title in 1838, having previously in 1837 taken possession and continued the same until Brown entered.

A decree, by consent of parties, was entered in November, 1847, after the adjournment of the regular term, requiring a specific performance, &c., the personal property to be appraised by the sheriff of Warren county.

*A. Williams & C. B. Lawrence,* for the appellant.

An agreement to make a good and sufficient deed of warranty is to be construed as an agreement to make a deed

that shall pass a good title. The agreement refers to the title to be conveyed, and not to the form of the deed. *Chute* v. *Robinson*, 2 Johns. 595; *Judson* v. *Wass*, 11 do. 526; *Evertson* v. *Kirtland*, 4 Paige, 638.

Courts will not decree a specific performance in behalf of vendor, unless he can show a title free from doubt. *Marlow* v. *Smith*, 2 Peere Williams, 201; *Stapylton* v. *Scott*, 16 Vesey, 271; *Jervaise* v. *Duke of Northumberland*, Jacob & Walker, 547; *Lowes* v. *Lusk*, 14 Vesey, 549; *Sheffield* v. *Lord Mulgrave*, 2 do. 526; *Roake* v. *Kidd*, 5 do. 647; 2 Mad. Ch. 434; *Seymour* v. *Delahay*, 6 Johns. Ch. R. 222; *Garnett* v. *Macon*, 2 Brock. 207; 1 Sug. on Vendors, 425.

Courts will not decree a specific performance in favor of a party who is himself in default, a specific performance being not "*ex debito justitiæ*," but resting wholly in the discretion of the Court. The complainant in those cases must come into Court with clean hands. *Seymour* v. *Delahay*, 6 Johns. Ch. R. 222.

The decree was erroneous in directing the sheriff to value the property.

*O. H. Browning & N. Bushnell*, and *R. S. Blackwell*, for the appellee.

1. The neglect of the complainants to make the repairs stipulated in his contract of sale, does not constitute such a substantial failure on his part as will justify a Court of Equity in decreeing a rescission of the contract, but is a proper case for compensation. 2 Story's Eq. Jur. § 775.

2. There is enough evidence to satisfy the Court that the complainant tendered a deed to the defendant.

3. A specific performance will be decreed on the application of a vendor, notwithstanding a defect in his title, when the contract was made, if he is in a condition to make a good title by the time the decree is rendered. 2 Story's Eq. Jur. § 777.

The evidence shows that Cannon entered into the possession of the premises in 1837; that he acquired title in 1838, and continued in possession until Brown entered under the

contract in 1845, and that Brown continued that possession down to the time the decree in this cause was rendered, which was in the fall of 1847. So that it appears Cannon and Brown had a continuous and uninterrupted possession of the premises in controversy, under a connected chain of title deducible of record from the U. S. for the period of nine years. The outstanding title which is relied upon as casting a *cloud* upon our title, accrued in 1836. The right of entry of the adverse owner is, therefore, tolled by the Statute of Limitations, his remedy barred, and complainant's title has ripened into a paramount one. Rev. Stat. 349, § 8.

But it is insisted that that title may belong to an infant, *feme covert*, or some other person laboring under disability created by law, and whose rights are therefore saved by the Statute of Limitations. To this we answer, these disabilities are exceptions, and must be shown by those who rely upon them. There can be no presumption in such a case unfavorable to the title of the complainant. The burden of proof is upon the party setting up the outstanding title. We show a *prima facie* title; the defendant sets up an outstanding adverse title; to this we reply, seven years' continuous possession; if, then, they insist that the adverse title belongs to some person laboring under the disability of infancy, coverture, &c., they must prove it, or they have not cast a cloud upon our title.

There is also some evidence in this case, that defendant knew of this adverse title when he purchased; if so, he cannot resist a specific execution upon this ground. 2 Story's Eq. Jur. § 778.

The Opinion of the Court was delivered by

CATON, J. In this case both parties were equally in fault, and neither should be allowed to complain, that the other had not technically, and punctually fulfilled. The complainant did not have the improvements completed as he had agreed, by the first of June. This default was not of such importance, that the Court might not disregard it, or make a compensation in damages. So also, was Brown in default,

by not being ready by the same day, to make the four hundred dollar payment, which was to be paid partly with two horses, a carriage and harness, and the balance in cash. Some slight excuse is offered by the complainant for not completing the ceiling of the house, such as that the lumber was not yet sufficiently seasoned; and the defendant offers a very satisfactory reason why he was not there by the first of April. It was known that he resided in Ohio, when the contract was made, whence he was to come, and take possession in the ensuing spring. On account of high water, he was delayed till the third of April, and very soon after he took possession of the farm, and offered to deliver the horses and carriage at a value to be ascertained by third persons, if the parties could not agree, and to pay the balance of the four hundred dollars in money. The complainant refused to receive the property, but insisted that the whole of that instalment should be paid in money; or at any rate, all except one horse, which he sometimes said he was willing to take. For this he sometimes assigned as a reason, that the property was not delivered on the very day, and sometimes, that the mare was not of the precise description represented when the contract was made. Upon two occasions, Cannon attempted, or pretended to tender a deed to Brown, but it is manifest that he did not intend to let Brown have the deed unless the four hundred dollars were paid in money. Although the testimony is somewhat contradictory, as to these transactions, we are satisfied from a careful examination of all the evidence, that Cannon was desirous of being able to say here, that he had tendered a deed, rather than that Brown should accept it, and make the payment according to the original contract. Throughout, Cannon has manifested a determination to take advantage of Brown's accidental delay of a few days, forgetting that he was as much in default, by not having the repairs completed by the time agreed upon. In neither case was the delay hardly of sufficient importance, or injury, to require a Court to notice it. Besides, by transferring the possession of the farm on the fifteenth of June, and thus proceeding with the contract,

after both parties had been guilty of failing to perform strictly, they mutually waived the right to complain of such non-performance. And independently of that waiving of these mutual failures, one is a fair set-off against the other. Neither party then could complain of the other till he had put his adversary in default by a substantial performance on his part, and a failure or refusal to perform by the other. The complainant should have presented the deed and offered to deliver it, subject only to the condition that Brown should deliver the property as agreed upon, and pay the balance of the four hundred dollars in money. Without this, there is no sufficient consideration to compel Brown to act. *Doyle* v. *Teas*, 4 Scam.

This the complainant has never done. The evidence shows that Brown advanced about as far towards performance as Cannon did. He frequently offered to deliver the property and pay the balance in money, but he never formally tendered either, and it is manifest from the evidence that he was pretty strongly induced to have his own price for the property, which he had agreed to deliver. On the whole, we are well satisfied that neither party has as yet performed his part according to the spirit and substance of the agreement, but each has manifested a desire to get some technical advantage of the other, so that he might realize little better results than he was in good faith entitled to. When the Court sees such a disposition manifested, its suspicions are at once awakened, and it will look with no extraordinary degree of favor upon the claims of parties, based upon acts, which were never designed in good faith to carry out a contract, but rather to secure a technical advantage.

But there is another objection of much graver importance. Brown insists that there is such a doubt hanging over the complainant's title, that he ought not to be compelled to take it. It is admitted on both sides that the title shown by the record stands thus: The complainant shows a regular chain of title from the United States to himself. Against this stands a tax deed for the principal part of the premises, issued in 1836, the sufficiency of which was not questioned

Brown *v.* Cannon.

on the argument.   In answer to this, the complainant shows
that he has been in possession since 1838 claiming title
under his deed, and adverse to the tax title.   This would be
sufficient to maintain ejectment against any one defending
under the tax title, except as to persons against whom our
seven years' limitation law did not run, and would consti-
tute an absolute title, but for the claims of infants, *feme
coverts*, and others disabled to assert their claims, whose
rights are excepted from the operation of that statute.   It
does not appear whether or not there are any such persons,
holding the tax title, and the question now is, whether the
chance of there being such persons, is sufficient to create
such a doubt, of the sufficiency of the complainant's title,
which now rests entirely on his adverse possession as to
justify the complainant in refusing to complete the purchase.
A reference to a few of the many authorities on this subject
will suffice to show what the law is.

In 1 Sug. on Vend. bottom page 339, it is said: "To enable
Equity to enforce specific performance against a purchaser,
the title to the estate, ought, like Cæsar's wife, to be free
even from suspicion; for it would be an extraordinary pro-
ceeding for a Court of Equity to compel a purchaser to take
an estate which it cannot warrant to him."   And in *Stapyl-
ton* v. *Scott*, 16 Ves. 272, although Lord Eldon was of opin-
ion that the title was good, yet inasmuch as some doubt was
implied by a provision of the will of the ancestor, of the
title to a part of the estate, he refused a specific performance,
notwithstanding the Master reported a perfect title.   In
*Lowes* v. *Lusk*, 14 Vesey, 547, a specific performance was de-
nied, because the vendor had committed an act of bankrupt-
cy, although he swore on an examination before the Master,
that there were no debts on which a commission could issue,
and there was no evidence tending to show that there were
such debts, by which alone the title could have been endan-
gered.   *Drew* v. *Clark*, 9 Vesey, 368.   The complainant was
entitled to a term of four thousand years, and a forfeited
mortgage on the reversion in fee, yet the bare possibility of

a redemption of such a dry remainder, induced the Court to refuse a performance. In *Sheffield* v. *Mulgrave*, 2 Vesey, 526, the chancellor refused to compel a party to receive a title, although it had been found to be good by a Court of Law, because he suspected that there might be some latent Equity existing against it. The Chancellor in the case of *Roak* v. *Kidd*, 5 Vesey, 647, refused to direct a trial at law to ascertain if the title was good, when the defendant objected and the Court entertained doubts of the sufficiency of the title, but dismissed the bill. On this subject also, Chief Justice Marshall, in the case of *Garrett* v. *Macon*, 2 Brock. 244, says : "Both on principle and authority, I think it very clear that a specific performance will not be decreed on the application of the vendor, unless his ability to make such a title as he has agreed to make be unquestionable." These references might be extended, but we deem it unnecessary.

The rule of law, then, undoubtedly is, that a purchaser who bargained for a good title, shall not be compelled to take one which is subject to suspicion. This does not mean that the title shall be good beyond a possible peradventure, for then he might never be satisfied, but then it must free from reasonable doubt. It must be such a title to which no reasonable man would object ; such an one as a prudent man would not hesitate to invest his own money upon, at a full market price ; such an one as will bring, in the market as high a price with, as without the objection. When we force a title upon a party, we must feel an assurance that it cannot be taken from him. It is not sufficient that the title is probably good, but we must feel a reasonable certainty that it is so.

Is the complainant's title thus clear, is the important question. Of all known titles to land beyond a mere naked possession, which are *prima facie* good, there is perhaps none, recognized by law, more doubtful and uncertain, than those depending for their validity upon an adverse possession under a Statute of Limitations ; and especially are such titles unsatisfactory, when they depend upon a limita-

tion law of recent date, prescribing a short time, and which does not run against those who may not immediately assert their rights.

The cases already referred to, show that it is not sufficient, in all cases, to show a title *prima facie* good, as was contended for by the counsel for the complainant. It is for him to make out a title free from reasonable suspicion or doubt, and not for the defendant to show that his suspicions are certainly well founded, and that the title offered him must fail. It is sufficient for him to point out a way in which it reasonably may fail. It is not for him to hunt up those persons who may come in and destroy the title, but the complainant should show with reasonable certainty, at least, that there are none such; that the tax title was in one against whom the statute under which his possession becomes available, did run. We will not say that lapse of time would in no case satisfy us, for although it is possible that the title might pass from infant to infant, for an indefinite length of time, so that the statute would never commence its operation, yet after a time, that would become so very improbable as not to excite the apprehension of a reasonable mind. In the case of *Seymore* v. *DeLancey*, Hopkins' R., Chancellor Sanford says: "But if the possession of William Seymore had been clearly adverse for twenty five years, his title would not, I think, be sufficiently impeached, either by the slight proof that Henry E. Lutterloh may have been an alien, or, if he was a citizen, by the mere contingency, that his title may have resided since his death, in persons disabled to assert their rights." Lutterloh had at that time been dead about thirty nine years. Such a length of time may have been sufficient to allay all reasonable apprehensions in the opinion of the Chancellor. While this case may show, so far as a mere dictum can do so, that a title depending upon adverse possession, under limitation laws, may become satisfactory, it by no means asserts that the Court will in all cases compel a party to receive such a title. The cloud which may hang over a title, may be of every imaginable shade of obscurity from that which admits of neither light nor hope, to that which is scarcely perceptible.

While we may not require the title to be free from every speculative doubt, it ought not to be subject to a reasonable one—such as would excite a just apprehension. If such doubt exist, the complainant must clear it away, till his title would bring as much in market as if no question were made in relation to it. Has this been done with the title before us? We think not. We cannot say that it certainly is a good title. In the language of one of the authorities, we cannot warrant it to the purchaser. What reasonable man, owning this title, would not prefer to have this doubt removed—this cloud dissipated? Who would not give a valuable consideration to obtain a complete release of all such outstanding claims as might exist? Who would not pay his money more freely, and make his improvements with a greater feeling of security, if this uncertainty were not resting upon his title, for there surely is an uncertainty about it? No prudent individual would be willing to assure this title for nothing, and we ought not to compel the defendant to take it for a clear title, and pay a full price without such assurance. After being compelled to do so, he would still be glad to pay something more, to be made certain that none could contest his rights.

Our revenue laws, under which tax titles are obtained, secure to persons not able to assert their claims, a right to redemption for two years after their disabilities cease, and we all know that a tax title, otherwise unquestionable, will not bring any thing like a full price, when the condition of the person holding the former title is not known. When there may be such right of redemption, it is believed that a guaranty is always required, and never refused, against such a contingency, when a full price is paid. The man who would ask or give as high a price for a title thus obscured and doubtful, as for one about which no question could be raised, would be considered extravagant or reckless, if not worse. The cases are parallel. This title may be good. We cannot say that it is not, nor can we say that it is, which we ought to be able to do, before we force it upon the party.

For two reasons, then, should the bill have been dismissed.

Brown *v.* Cannon.

When it was filed, the complainant was as much in default as was the defendant. Neither party had strictly performed, nor yet had either party abandoned the contract. The defendant still retained possession of the farm, with the consent of the complainant. Again, the complainant has not shown such a title as Brown should be compelled to accept and pay for. Whether the objections to this title can be cleared up, we do not know, as each party seems to have proceeded on the assumption that the burthen of proof was on the other.

There is another objection to the decree which we feel called upon to notice. Assuming that the Court was right in decreeing a specific performance by both parties, it was improper for the decree to direct the sheriff to appraise and value the horses, carriage and harness. The value of these articles might have been found by the Court, if it were satisfied from the evidence before it, or it should have been referred to a Master or Special Commissioner—who, to be sure, might have been the sheriff—to have determined the same upon proof and made a report thereof. Whether the value of the property was found by the Court directly, or through the medium of a proper officer, it should in either case have been done through the medium of testimony, and not by the judgment of the Court or officer on inspection. In that way alone could the right of either party be secured to have the question or judgment reviewed. This is not one of those cases where the Court may appoint Commissioners to act on view. Here the decision of the sheriff was made final, concluding the parties, and to be acted upon immediately. Whether the officer to whom a reference is made hears testimony, or decides upon his own observation and judgment, in either case, his determination should be reported to, and approved by the Court, before it becomes final.

The decree of the Circuit Court must be reversed with costs, and the bill dismissed, but without prejudice.

*Decree reversed.*